IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIE WILLIAMS,<br><br>Defendant. | Case No. 19-cr-00341-CRB-1<br><br>**ORDER RE PROLONGATION** |

    Three and a half years ago, this Court denied Defendant Willie Williams's motion to suppress evidence that San Francisco Police Department officers uncovered in his car after they stopped him for having non-functioning brake lights. See Order Denying Motion to Suppress (dkt. 37). The Court found, among other things, (1) that the stop was proper, and (2) that the officers did not unlawfully prolong the stop in order to investigate the brake lights and an inconsistency with Williams's license plates. Id. at 2. The Ninth Circuit disagreed as to the latter point; it vacated and remanded, directing this Court to consider a new argument the government made in support of prolongation. See USCA Memo. (dkt. 289). That argument was that "the officers had reasonable suspicion that Williams possessed firearms or controlled substances" in light of "Officer Roche's past observations of Williams loitering near the 200 block of Golden Gate Avenue, a high-crime area, and associating with known criminals, coupled with the fact that Williams was spotted two to three blocks from the 200 block of Golden Gate Avenue, driving in a trajectory consistent with having left that block." Id. at 9–10. The Circuit expressed skepticism about this argument. See id. at 10 n.3 ("Our precedent casts doubt on the government's unparticularized theory of suspicion") (citing United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)).

Upon remand, the government requested that this Court decide the matter based on briefing and without an evidentiary hearing. Gov. Statement re: Status Post-Remand (dkt. 294) at 1. Williams argued that the Court could decide the matter without any additional briefing but agreed in any case that an evidentiary hearing was not necessary. Def. Status Report (dkt. 295) at 2. The Court requested briefing, see Status Conference (dkt. 292), and that briefing is now complete, see Gov. Memo. (dkt. 296); Def. Memo. (dkt. 300); Gov. Reply (dkt. 301). As explained below, the Court concludes that the officers did not have reasonable suspicion that Williams possessed firearms or controlled substances, and therefore GRANTS the motion to suppress.

## I.   LEGAL STANDARD

Warrantless searches and seizures are presumed to be unreasonable unless they fall within "a few specifically established and well-delineated exceptions." United States v. Scott, 705 F.3d 410, 416 (9th Cir. 2012). "The government bears the burden of justifying a warrantless search." United States v. Johnson, 936 F.2d 1082, 1084 (9th Cir. 1991). If the government fails to meet this burden, evidence obtained as a result of the illegal search or seizure cannot "constitute proof against the victim of the search." Wong Sun v. United States, 371 U.S. 471, 484 (1963); see also United States v. Lundin, 817 F.3d 1151, 1157 (9th Cir. 2016).

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 575 U.S. 348, 354 (2015). But "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" Id. at 355 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)). "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop" but not "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id.

"[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." Montero-Camargo, 208 F.3d at 1129 (emphasis in original). "Although the level of suspicion required for a brief investigatory stop is less demanding than that for probable cause, the Fourth Amendment nevertheless requires an objective justification for such a stop." Id. The

2

officer therefore "'must be able to articulate more than an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity.'" Id. (quoting Illinois v. Wardlow, 528 U.S. 119, 123–24 (2000)). Particularized suspicion is based on "the totality of the circumstances" and "must arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime." Id. (emphasis in original) (citing United States v. Cortez, 101 S. Ct. 690, 695 (1981), Terry v. Ohio, 392 U.S. 1, 21 n.18 (1968)).

## II.   DISCUSSION

The Ninth Circuit held that the officers prolonged their stop of Williams when they made "inquiries about consent to search Williams's car and marijuana possession." USCA Memo. at 2. The government must therefore demonstrate that the officers had reasonable suspicion to believe that Williams's car contained evidence of firearm or drug offenses before the prolongation occurred. Gov. Memo. at 2–3. The government asserts that "[t]hree principal facts" combined to give the officers that reasonable suspicion. Id. These "facts" are (A) that Williams's registration was "questionable," (B) that the officers likely observed bullet holes in Williams's car, and (C) that Officer Roche was familiar with the 200 block of Golden Gate Avenue and (to a lesser extent) Williams. Gov. Memo. Independently and together, the registration, bullet holes, and Officer Roche knowledge do not amount to reasonable suspicion.

### A.   Registration

The government argues that the officers' suspicions about Williams were compounded by the "additional confirmation from dispatch that there were no records for Williams's license plate in the DMV database." Id. at 9. It contends that "[a]lthough the Court of Appeals found that [the] officers no longer had a basis to suspect that the car was stolen after Williams presented them with his registration card and dispatch confirmed the car's registration to Williams, this Court has already recognized the still-lingering questions as to the validity of the car's registration following the stop." Id. But what this Court recognized in February of 2020[1] is beside the point; the Ninth Circuit reviewed this Court's decision and concluded that the registration was no longer

---

[1] See Order Denying Motion to Suppress at 2 (holding that the officers were still reasonably confused about Williams's registration and plates at the time of the prolongation).

"questionable" at the time of the prolongation. See USCA Memo. at 3 ("Notably, the officers' consent and marijuana inquiries came after the objective evidence revealed that Williams was the car's registered owner.").[2]

Because the registration issue was resolved at the time of the prolongation, the officers no longer should have been concerned that the car was stolen. The government argues, though, that "questions about the validity of Williams's plates, quite apart from any concern that the car was stolen, contributed [to] the independent reasonable suspicion to investigate whether [Mr.] Williams possessed narcotics or illegal firearms." Gov. Memo at 9 (emphasis added). This is an entirely different position than the government took before the Ninth Circuit. See USCA Memo. at 2 ("The government argues that the mission of the stop was not only to address the traffic violation for non-functioning brake lights, but also to investigate the possibility that the car was stolen, which Officer Roche suspected when the DMV database returned no registration information during his records check."). It is also contrary to Officer Roche's testimony at the evidentiary hearing, which the Ninth Circuit recounted in its opinion. See id. at 4–5 ("At the evidentiary hearing, Officer Roche was asked 'consent has nothing to do with a bad registration, does it?' and '[t]he request for consent had nothing to do with your records search, did it?' Officer Roche responded, 'No.' Officer Roche was then asked, 'And [the] marijuana investigation had nothing to do with your records check?' Officer Roche again replied, 'No.'").

Moreover, it does not make sense. If the officers "no longer had a basis to suspect that the car was stolen," then it is unclear how inconsistencies with the registration and plates would have suggested anything negative about Williams, let alone that he was "involve[d] in drug trafficking, by giving a trafficker false cover and misdirection." See Gov. Memo. at 9; see also Def. Memo. at 8 ("the government does not explain what the officers could have suspected that Mr. Williams had done (short of hacking into the DMV) to produce a 'no record' result in the DMV database after

---

[2] That the government advances this argument at all is perplexing given the Ninth Circuit's opinion and its instructions on remand, which even the government characterized as excluding the registration issues. See Gov. Memo. at 2 ("It remanded for a specific finding as to 'whether the officers' prolongation' of Willie Williams's traffic stop in June 2019 was 'supported by independent reasonable suspicion'—leaving aside the license and registration issues, on which ground the motion to suppress had been principally litigated.").

4

registering his car with the DMV and affixing the license plates corresponding to his registration.").[3]  A stolen car with fake plates might give a trafficker false cover and misdirection. A database error does not.  See ER-390 (dkt. 296-1) (Appellate Excerpts of Record) ("THE COURT: So it's a total screw-up by—by DMV.  I mean, isn't it? [GOVERNMENT]: It—it—probably is.").  The registration issue therefore does not support reasonable suspicion.

### B. Bullet Holes

The government next argues that the officers had reasonable suspicion because they "likely observed, before prolonging the stop, that the hood and body of Williams's car was riddled with bullet holes."  Gov. Memo. at 7.[4]  The government concedes that "Officer Kerry Mullins, Roche's partner, did not ask Williams to explain the bullet holes in the hood and body of his car until about three minutes and forty seconds after . . . the prolongation began."  Id.  But the government insists that "[t]he bullet holes would have been obvious to an officer looking at a car suspected of being used in criminal activity in broad daylight."  Id.  In its reply brief, the government notes that Officer Roche actually testified at trial that he saw the bullet holes before he stopped Williams's car.  See Gov. Reply at 1 (quoting 11/8/21 Tr. (dkt. 273) at 36 of 234) ("Q. Officer Roche, did you notice anything about Mr. Williams's car before you had stopped it?  A. Yes, sir, I did.  Q. And what did you notice?  A. There were bullet holes, or what I believed to be bullet holes in the hood of the vehicle.").  The Court recognizes that it can "rely on the testimony given at trial to sustain the denial of a motion to suppress evidence, even if such testimony was not given at the suppression hearing."  See United States v. Brown, 996 F.3d 998, 1002 n.1 (9th Cir. 2021).  The Court will indeed rely on Officer Roche's trial testimony as evidence that Officer Roche observed

---

[3] The government asserts that it is "simply observing that just because the license and registration anomalies—which to this day remain a mystery—did not themselves independently establish suspicion, that does not mean that they cannot have contributed to it."  Gov. Reply at 4.  But the government never articulates how those things contributed.

[4] The government contends that it "repeatedly raised this fact [to the Ninth Circuit] as an additional ground for reasonable suspicion to support the stop."  See Gov. Reply at 4 (citing Case No. 22-10052 dkt. 20 (Appellee Br.) at 15, 67, 69).  The cited pages reference that "Officer Mullins observed that the hood of the Mercedes was riddled with at least eight bullet holes" and describe Officer Mullins's discussion with Williams about the bullet holes, see Case No. 22-10052 dkt. 20 (Appellee Br.) at 15, list the bullet holes as a basis for probable cause to justify the vehicle search under the automobile exception, id. at 67, and argue again that the bullet holes and Williams's explanation for them supported probable cause, id. at 69.

5

the bullet holes before the prolongation occurred.[5]

But, as Williams points out, Officer Roche did not mention the bullet holes in his bodycam video, police report, or declaration, nor did he testify about them at the suppression hearing. See Def. Memo. at 6.[6] During the incident, Officer Roche did not ask Williams, or instruct Officer Mullins to ask Williams, about the bullet holes. See USCA Memo. at 2. The government does not point to any trial testimony from Officer Roche that the bullet holes had any meaning to him. The government does not point to any trial testimony from Officer Roche that the bullet holes made him suspicious that Williams was involved in a crime. The government does not point to any trial testimony by Officer Roche that the bullet holes were in any way part of his calculus when he prolonged the encounter.

This is likely because the bullet holes would not have given a reasonable officer objective justification for a stop. See Montero-Camargo, 208 F.3d at 1129. The government disagrees, citing to a number of cases, most from outside of this circuit. See Gov. Memo. at 8 ("With the bullet holes factored into the analysis, the evidence of independent reasonable suspicion is abundant.") (citing United States v. Howard, 60 F. App'x 33, 36 (9th Cir. 2003) (unpublished); United States v. Daychild, 357 F.3d 1082, 1100 (9th Cir. 2004); United States v. Gonzales-Quinonez, 287 F. Supp. 2d 1032, 1035 (D. Ariz. 2003); United States v. Palmore, No. 7:21-CR-52-WLS, 2022 WL 17478240, at *5 (M.D. Ga. Dec. 6, 2022); United States v. Rogers, 861 F. App'x 8, 14 (6th Cir. 2021); United States v. Lindsey, 505 F. Supp. 2d 838, 844–45 (D. Kan.

---

[5] Williams has filed an objection, arguing that he did not have a reason at trial to challenge Officer Roche's testimony about the bullet holes, as it "bolster[ed] the pretrial suppression ruling but is not particularly damaging on the issue of guilt or innocence.'" Objection to New Evidence in the Reply (dkt. 302) at 2 (citing 6 W. LaFave, Search and Seizure §11.7(d) (6th ed. 2022)). Williams also argues that the jury had no reason to assess this piece of testimony. Id. This argument is somewhat undercut by defense counsel's objection to the bullet hole evidence at trial. See 11/8/2021 Tr. (dkt. 273) at 12 of 234 (Defense counsel: "some of the focus had been questions by the officers about whether Mr. Williams's car had shots—a bullet shots in it. And we're not sure what the relevance of that is, whether it's through testimony or through the clips. And it's certainly prejudicial implication of it."). In any case, the Court will accept Officer Roche's trial testimony on this point but explain why such testimony is not significant as to reasonable suspicion.

[6] See, e.g., 1/30/20 Tr. (dkt. 59) at 7 ("Q. And did you notice anything about the vehicle when it stopped? A. Yes. Q. What did you notice? A. It appeared to me that none of the brake lights were working on the vehicle.").

2007); United States v. Hester, No. 5:05-CR-382, 2006 SL 533747, at *2 (N.D.N.Y. Mar. 3, 2006); United States v. Lindsey, No. 03-40011-01-RDR, 2004 WL 1846123, at *7 (D. Kan. May 6, 2004)). Those from this circuit are distinguishable.[7]

In Howard, 60 F. App'x at 36, the Ninth Circuit stated that "A reasonable person would believe that where bullets are found, guns are also likely to be found." But in that case, where the issue was whether the police had probable cause to search inside a car, "officers observed bullets both outside and inside the car," and "had also found drugs right next to the car at the spot where [the defendant] had bent down just after placing objects in the car," and the officers "were also familiar with [the defendant's] record and had been called out due to a disturbance." Id. The court concluded without much difficulty that these facts "were sufficient to warrant a belief that evidence of a crime would be found in the car." Id. Here, the bullet holes in Williams's hood (not bullets)—without the other facts present in Howard—were far weaker support for the notion that a firearm or drugs would be found in Williams's car.

Daychild, which the government cites as "recognizing the link between drug and firearm offenses," see Gov. Memo. at 8, did not involve bullet holes or reasonable suspicion. See 357 F.3d at 1100. Moreover, no one disputes that there can sometimes be a "link between drug and firearm offenses." Daychild does not address the issue here—the link between bullet holes on the one hand and drug and firearm offenses on the other. And while Gonzales-Quinonez, a District of Arizona case, mentioned bullet holes, the bullet holes were irrelevant. See 287 F.Supp. 2d at 1035. The court there found that the stop of the defendant's "vehicle was justified because [the officer] had an objectively reasonable belief that [the defendant] had violated Arizona traffic laws" or alternatively, that the officer "had reasonable suspicion that [the defendant's] vehicle was stolen." Id. at 1036. The officer believed that the defendant had violated traffic laws because the

---

[7] Those from outside of this circuit are as well. See Def. Memo. at 7 n.6. The single other circuit court case upon which the government relies, see Gov. Memo. at 8, contains wildly different facts. In Rogers, 861 F. App'x at 14, the officer knew that a "store had been robbed and that an off-duty police officer exchanged gunfire with the robbers," and that the getaway vehicle was "a gold or tan mid-size SUV 'resembling a Chevy Equinox,'" and so had reasonable suspicion when he saw "an Equinox that matched that description with a visible bullet hole" "20 minutes later and only a few miles from the crime scene."). Williams's car had bullet holes but none of the other Rogers facts.

7

truck's license plate was not securely fastened. Id. at 1036–37. The officer believed that the truck might have been stolen because it had a broken side window, was a Dodge (which are apparently often stolen), was on a route known for smuggling, was a 4-wheel drive vehicle, and had a temporary license plate. Id. at 1037. Although the truck had bullet holes in it, the officer did not observe them until after he had pulled it over and three occupants tried to flee. Id. at 1035. The court did not revisit the significance of the bullet holes, nor hold that the bullet holes warranted the officer's suspicion.

The government did not cite to any authority for the proposition that an officer may pull over or search a vehicle based on the presence of bullet holes in the vehicle's exterior. The government insists, though, that "there are exceedingly few scenarios in which a vehicle's hood is pocked with bullet entries that do not involve some form of illegal conduct." Gov. Reply at 4. While that exceedingly broad statement is not exactly wrong—in all likelihood, a person who shoots at a civilian vehicle does so illegally—there are plenty of scenarios in which the driver of a car with bullet holes in it might not have been engaged in the illegal conduct. The driver of such a car might have been the victim of a crime. See Case No. 22-10052 dkt. 20 (Appellee Br.) at 15 ("When Officer Mullins asked about it, Williams recounted that he and '[his] partner' had been the victims of a drive-by shooting in Oakland about a month earlier."); cf. Riggs v. City of Anaheim, No. 8:21-cv-00749-JVS (ADSx), 2022 WL 17327319, at *8 (C.D. Cal. Aug. 17, 2022) (information provided to officer "painted [individual as] the victim," and officers may even have believed that individual was "the victim of a crime," which cuts against reasonableness of Terry stop). The driver of such a car might not have owned or been driving the car when the car was shot at. Even if the driver of the car was engaged in criminal conduct at some point in the past when the car was shot at, that does not mean that officers will necessarily have reasonable suspicion that the driver is currently engaged in criminal conduct.

Accordingly, the bullet holes in Williams's car—particularly without the kinds of facts present in Rogers, 861 F. App'x at 14, or Howard, 60 F. App'x at 36—do not support reasonable suspicion.

### C. Officer Roche Familiarity with High Crime Area and Williams

Finally, the government argues that the officers had reasonable suspicion because Officer Roche recognized Williams as a suspected drug dealer whom he had seen on or near the 200 block of Golden Gate Avenue, a high crime area only two blocks away from the stop. Gov. Memo. at 4. This is the argument that the government made to the Ninth Circuit, about which the Ninth Circuit was skeptical. See USCA Memo. at 9–10, 10 n.3.[8]

#### 1. Evidence

The evidence the government points to in support of this argument is as follows. In his Incident Report, Officer Roche wrote in part:

> I have observed Williams multiple times in the past loitering near the 200 block of Golden Gate Avenue. I have observed Williams associating with other known drug dealers and people who have been arrested for firearms violations. I have also observed Williams' Mercedes parked on the 200 block of Golden Gate Avenue multiple times in the past. This specific area is known to me as a high crime area where narcotics, especially pills, are commonly sold. This area is also known for shootings, robberies, stabbings, aggravated assaults, firearms violations, and other violent crimes. Due to the fact that I have observed Williams and the Mercedes on the 200 block of Golden Gate Avenue multiple times in the past, and also observed him with other known drug dealers, I believed Williams was possibly involved in illegal narcotics activity.

ER-125; see also ER-218 ("Q. . . . You had seen [Williams's car] around an area where drug dealers were known to be. You had seen it in an area where you had seen – know people sold guns. And seen it enough times that you suspected that that particular car was involved in criminal drug activity; right? A. Yes."); see also 1/30/20 Tr. (dkt. 59) at 137 ("Q. And did you— can you remind us of how, in what context, you had recognized Mr. Williams? A. I don't believe I've ever—to the best of my knowledge, I don't think I've actually contacted him personally, but I believe that, you know, I recognize him from someone that I have seen on the 200 block of Golden

---

[8] To recap, the government argued that "the officers had reasonable suspicion that Williams possessed firearms or controlled substances" in light of "Officer Roche's past observations of Williams loitering near the 200 block of Golden Gate Avenue, a high-crime area, and associating with known criminals, coupled with the fact that Williams was spotted two to three blocks from the 200 block of Golden Gate Avenue, driving in a trajectory consistent with having left that block." Id. at 9–10. The Circuit stated: "Our precedent casts doubt on the government's unparticularized theory of suspicion." Id. at 10 n.3 (citing Montero-Camargo, 208 F.3d at 1129).

9

Gate Avenue. I—I had seen him multiple times in the past and recognized his face."); ER-88 ("To the best of my knowledge, prior to this stop, I never had contact with Mr. Williams. However, after approaching the vehicle, I recognized him as someone I have observed who has associated with known drug dealers in the Tenderloin in the past.").[9]

Roche also testified that because of his experience and training, he knew that sometimes drug dealers keep their drugs in their cars. ER-219. Roche had been an officer for about five years, during which time he was involved in over 50 traffic stops. ER-244. He received over 40 hours of "narcotics and dangerous drugs training." ER-87. And he had "worked with more experienced officers in the field of narcotics." ER-190. He had worked the foot beat in the Tenderloin from January 2017 to June 2019. ER-88.

### 2. Analysis

The government argues that the Court has already found Officer Roche's testimony credible, see Gov. Memo. at 5 (citing ER-370), and so it should "consider Roche's suspicions about Williams's involvement in drug dealing as part of the reasonable suspicion analysis," see id. at 5. The Court does consider Officer Roche's testimony as part of the reasonable suspicion analysis—indeed, in the Court's view, it is the only support for reasonable suspicion. The question is whether it is adequate support. The Court therefore examines Officer Roche's testimony as to the three relevant subjects here: (a) Officer Roche's training, (b) his familiarity with the 200 block of Golden Gate Avenue, and (c) his familiarity with Williams.

#### a. Training

The testimony about Officer Roche's training and experience is unassailable. The totality of the circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449, U.S. 411, 418 (1981)). Officer Roche had the training to recognize that (as discussed below) a number of crimes occur on the 200 block of Golden Gate

---

[9] Officer Mullins declared only that he recognized Williams as someone whom he "had seen in the Tenderloin before." See ER-93.

10

Avenue,[10] including the sale of pills, and that drug dealers often keep drugs in their cars. See ER-219; ER-244; ER-87; ER-190; ER-88. Williams does not dispute these points.

### b.  Familiarity with the 200 Block of Golden Gate Avenue

The testimony about the 200 block of Golden Gate Avenue is also unproblematic.

The Supreme Court has recognized that an individual's presence in a high crime area is not enough to support reasonable suspicion. See Brown v. Texas, 443 U.S. 47, 52 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct. In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood."). And the Ninth Circuit has observed that "[t]he citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." Montero-Camargo, 208 F.3d at 1138. The Ninth Circuit cautioned against treating as "high crime" "entire neighborhoods or communities in which members of minority groups regularly go about their daily business," explaining that a "high crime" area must be "limited to specific, circumscribed locations where particular crimes occur with unusual regularity." Id.; see also id. at 1139 n.32 ("With respect to populated areas, or areas in which people typically carry on legitimate activities . . . we . . . agree that more than mere war stories are required to establish the existence of a high-crime area.").

Officer Roche's testimony was appropriately circumscribed. It was limited to the 200 block of Golden Gate Avenue, rather than an entire neighborhood. See ER-125. It was also appropriately detailed. Officer Roche explained that the 200 block was a high crime area because it was "known for shootings, robberies, stabbings, aggravated assaults, firearms violations, and other violent crimes." See id.

### c.  Familiarity with Williams

Where Officer Roche's testimony fell short was about Williams.

#### i.  Loitering and Associating

---

[10] It does not take much training to recognize this.

11

Officer Roche stated in his Incident Report that in the past—but at no specified dates or times in the past—he had seen Williams "loitering near the 200 block of Golden Gate Avenue." See ER-125. He did not assert that he had seen Williams loitering on the 200 block of Golden Gate Avenue. See id.[11] While Officer Roche did say that he had seen Williams (and his car) "on the 200 block of Golden Gate Avenue multiple times in the past," he did not say that he saw Williams loitering on those occasions. See id.; see also 1/30/20 Tr. at 137 ("I recognize him from someone that I have seen on the 200 block"); id. at 30 ("I just recognize him as someone I had seen in the past also near the 200 block of Golden Gate Avenue.").

Officer Roche also stated that he had seen Williams "associating with other known drug dealers and people who have been arrested for firearms violations," though he did not actually say when that was or that it had occurred on the 200 block of Golden Gate Avenue. See ER-125; see also id. ("Due to the fact that I have observed Williams and the Mercedes on the 200 block of Golden Gate Avenue multiple times in the past, and also observed him with other known drug dealers, I believed Williams was possibly involved in illegal narcotics activity.") (emphasis added). And he did not explain what that associating consisted of, nor state that Williams was associating with the drug dealers while they were dealing drugs. See ER-125.

This is not terribly compelling evidence. An officer's familiarity with a person's criminal history or with his suspected involvement in criminal activity can, as the government notes, contribute to reasonable suspicion. See Gov. Memo. at 4 (citing United States v. Hernandez, 784 F. App'x 525, 526 (9th Cir. 2019); United States v. Roelandt, 827 F.3d 746, 748–49 (8th Cir. 2016); United States v. Perkins, 363 F.3d 317, 322 (4th Cir. 2004); United States v. Matlock, 724 F. App'x 492, 494 (8th Cir. 2018); United States v. Driver, 513 F. App'x 277, 280 (4th Cir. 2013)). But the cases the government cites—all but one not from this Circuit—illustrate just how insignificant Williams's occasional loitering near a high-crime block, occasional presence on that block, and occasional association with drug dealers who-knows-when-or-where is by comparison.

For example, in Hernandez, the Ninth Circuit affirmed the denial of a motion to suppress,

---

[11] The Court therefore disagrees with the government's contrary assertion in its reply brief. See Gov. Reply at 4.

12

holding that two U.S. Border Patrol agents who stopped an individual's car had reasonable suspicion to do so because: they relied on a text-based alert telling them that the individual's car was involved in human smuggling; they learned that the vehicle at issue had crossed into the United States 100 miles away and five hours earlier; they learned that the individual was alone at the time the vehicle crossed into the United States but now had three passengers; the individual and the vehicle "were the subject of ongoing human smuggling investigations"; the highway was "a known route for smuggling"; and the vehicle was going "abnormally slow[ly] and slightly weaving." 784 F. App'x at 526. Yes, in Hernandez, the officers did not know about the individual's past convictions (if there were any), "only ongoing investigations," id., but the officers knew a lot more about the individual than only that he was the subject of ongoing investigations. All of those facts combined to give rise to reasonable suspicion that the individual was right then in the process of smuggling his three passengers.[12]

      Here, in contrast, Officer Roche did not know about Williams's criminal history,[13] or even of any ongoing investigations, and had not seen him commit a crime in the past. Williams's past association with drug dealers who may not have even been acting as drug dealers when he associated with them is also paltry evidence of wrongdoing, particularly given that one's own criminal history is insufficient for reasonable suspicion. See Burrell v. McIlroy, 464 F.3d 853, 858 n.3 (9th Cir. 2006) ("Although a prior criminal history cannot alone establish reasonable suspicion or probable cause to support a detention or an arrest, it is permissible to consider such a fact as part of the total calculus of information in these determinations."). That Williams hung out near drug dealers did not mean that he was a drug dealer. See Montero-Camargo, 208 F.3d at 1139 n.32 ("both courts and law enforcement must be careful not to tar people with the sins of

---

[12] The cases that the government cites from other circuits are also distinguishable. See Def. Memo. at 3 n.1. For example, in United States v. Roelandt, 827 F.3d 746, 748–49 (8th Cir. 2016), the Eighth Circuit reversed the grant of a motion to suppress, holding that while the defendant's act of "walking quickly through a high-crime area and suspiciously looking around" might not have been sufficient for a Terry stop, "the police here also knew of [the defendant's] criminal history, his gang affiliation, the local pattern of retaliatory gang shootings, and the shooting of his close associate that very evening." The contrast between Roelandt and the facts here is stark.

[13] As it turned out, Williams had a significant criminal history. See PSR (dkt. 227) at 10–27. But that is as irrelevant as the government's assertion that Officer Roche "was, in fact, correct" that Williams was "involved with drugs and guns." See Gov. Reply at 4.

13

their neighbors,"); Perez Cruz v. Barr, 926 F.3d 1128, 1138 (9th Cir. 2019) ("mere propinquity to others independently suspected of unlawful activity does not, without more, give rise to . . . [r]easonable suspicion").

### ii.  Location and Trajectory

The evidence of Williams's connection to the 200 block of Golden Gate Avenue on the morning of the stop was also problematic. To be clear: the officers did not see Williams's car stopped on, and then leave from, the 200 block of Golden Gate Avenue before they pulled it over. And they did not see Williams engaged in any conduct, let alone drug dealing or firearm possession, on the 200 block of Golden Gate before they pulled him over.[14] Instead, the government asserts that Officer Roche knew that the 200 block of Golden Gate Avenue was "roughly 1,000 feet from the location of the stop." Gov. Memo. at 5. And it asserts that Officer Roche knew that Williams was "travelling northbound on Taylor Street from Golden Gate Avenue, a trajectory consistent with having just left the 200 block of Golden Gate Avenue." Id. at 9 (citing ER-191–92 (Williams's car was at Golden Gate and Taylor and drove to the intersection of Turk and Taylor before the officers stopped it at Turk and Jones); ER-88 (Williams drove northbound on Taylor from Golden Gate), ER-93 (same)). The government argues that "after they recognized Williams as someone believed to have been involv[ed in] illegal drug activity on the 200 block of Golden Gate Avenue, the location of the stop added to the independent reasonable suspicion that he currently possessed contraband in his vehicle." Id. at 9.

Accepting the government's assertion that "Williams must have been traveling east on the 100 block of Golden Gate, away from the 200 block of Golden Gate," Gov. Reply at 4, driving "away from the 200 block of Golden Gate" could just mean that Williams was driving through and past the 200 block of Golden Gate Avenue, which is not evidence of much of anything. Plenty of people drive along Golden Gate Avenue without committing any crimes. Williams adds that "away from the 200 block of Golden Gate Avenue" would also have meant toward home, which

---

[14] Nor has the government demonstrated that drug or gun violations tend to occur on the 200 block of Golden Gate Avenue at 7:55 a.m. on a Sunday, when this stop occurred. See ER-117 (reported date of 6/30/2019 and time of 7:57); ER-88 ("At approximately 7:55 a.m. that morning").

14

the officers would have known once they checked his documentation. See Def. Memo. at 5. Williams asserts that he lived on Ellis Street, which is three blocks north of Golden Gate Avenue. Def. Memo. at 5 (citing Ex_A 4:12–4:23 (officers reviewing Williams's driver's license and registration before prolongation); Ex_1 (registration showing Williams's address on Ellis Street)).[15] His residence on Ellis Street does not matter: without any additional facts suggesting that Williams had been on the 200 block of Golden Gate Avenue engaged in firearm or drug crimes on the morning of the stop, that he was near that block and driving away from it does not meaningfully add to the government's case for reasonable suspicion.

### 3. Conclusion as to Familiarity Evidence

The government's evidence about Williams loitering near, or being on, the 200 block of Golden Gate Avenue at unspecified times in the past, his associating with drug dealers at unspecified times and in unspecified places in the past, the location of the stop, and the trajectory of Williams's car do not amount to reasonable suspicion.

## III. CONCLUSION

The government relies on the precise "unparticularized theory of suspicion" of which the Ninth Circuit was skeptical. See USCA Memo. at 10 n.3. But the government fails to identify sufficient evidence to "arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime." See Montero-Camargo, 208 F.3d at 1129 (emphasis in original). Officer Roche had a "'hunch' of criminal activity.'" See id. That is not enough. See id. Accordingly, the Court concludes that the officers were not permitted to prolong the stop, and so the Court GRANTS the motion to suppress.

---

[15] It is unclear which documents Williams is citing to here. Attached as Exhibit 1 to Williams's brief is a picture of Williams's registration, which lists Williams's address as "Williams Wille Charles / [redacted] / San Francisco / CA 94102." Def. Memo. Ex. 1 (dkt. 300-1). Moreover, the Incident Report stated that Williams "Refused to provide home address; uses mailing address of [redacted] street (General Delivery)." See ER-118. There is, in the Excerpts of Record, a photograph of a gloved hand holding up Williams's registration, which appears to have been attached to the Incident Report, but the address for Williams is redacted in part, showing only "Williams Willie Charles / [redacted] St / San Francisco / CA [redacted]." See ER-129. The Court therefore cannot conclusively state that the officers knew that Williams lived on Ellis Street in San Francisco by the time of the prolongation. The Court does note that the government does not dispute Williams's assertion in its reply brief. See Gov. Reply.

**IT IS SO ORDERED.**

Dated: December 11, 2023

CHARLES R. BREYER
United States District Judge